**EXHIBIT G**

Gayle Freese
14 Beaver Lane
Setauket, NY 11733-3502
(631) 331-3057
freeboyle@msn.com

January 27, 2009

Mr. Frank Bail, President
Local 1102 RWDSU
1587 Stewart Ave.
Westbury, NY 11590

Re: Collective Bargaining Agreement between Local 1102 RWDSU UFCW
    And The Faculty Student Association (FSA) of Stony Brook University

Dear Mr. Bail

On October 7, 2005 I attended Local 1102's Shop Steward and Union Activist Conference at the Chateau Briand in Westbury and at the time I was impressed by what I heard and believed in; a Union that was supposed to fight for its members. Most impressive are those speakers who supported the integrity of Local 1102 such as Mr. Stuart Appelbaum, President of the RWDSU UFCW and Denis Hughes, President NYS AFL-CIO. No one told us that day that along with a sit down lunch we were also going to be fed some misinformation about how our Union was going to stand behind the contracts they negotiate and fight for its members by enforcing what was written in those contracts. No one told me that if I was a shop steward from a small shop; none of what I heard that day, applied.

On September 12th you sent me a letter explaining why Local 1102 would not go to arbitration to contest my discharge. I have consulted an attorney and I was advised to send you a certified letter requesting that you reconsider this decision and my only other option is to file a claim with the National Labor Relations Board.

In that letter you refer to the June 18, 2008 Decision and Award and my misconduct, which was my **third grievance** against my employer. Had David, Dennis or Ryan informed you that there was a history of contract abuse by FSA and that David had warned me that because I tried to **enforce what is written in our contract** "I would most likely have a target on my back and to expect some form of retaliation". That warning followed with verbal notification by Tom Edwards on December 20, 2007 that effective January 7, 2008, both of the USG Bookkeeper's

1

hours were reduced from 40 hours a week to 32 hours. This is **grievance number two.** I had a total of four grievances against FSA and the biggest letdown was that Local 1102 did not follow through and put its best foot forward to enforce the contract or defend my so called "misconduct"; which any perceived misconduct or response on my part was because I was being harassed and provoked.

**My first grievance** was over my vacation pay and FSA's failure to calculate earned vacation days by years of service. In July 2007 all FSA Employees received copies of their vacation accruals and were asked to verify that they were accurate. I informed FSA that I was 18 hours short and I was told that they had in fact, made a mistake and that I was only 8 hrs short. I provided them with a spread sheet calculating my time by **years of service,** only to be told that they do not do it that way that it is done by their fiscal year of July 1 through June 30, **contrary to what the union contract says.** I met with Velina Christensen, HR Mgr. of HRIS and Chris Oster, HR Manager Employee/Labor Relations and I was told by Ms. Oster that she could not give me the 10 hrs and that decision was up to Ron Willa, FSA'S Controller, and he may want to go to arbitration to fight this. Ms. Oster was one of the two signers on the contract; I would have thought that she would have at least read the contract before meeting with me. I contacted David Brijlall, since Ryan Delgado had left Local 1102, and also because David was familiar with whom he was dealing with at FSA. I emailed both David and Ryan Brunnet to inform them of my conversation with Ms. Oster and David had to pursue getting the additional 10 hrs for me. It took over three months before I finally received a phone call from Warren Wartell, Assoc. Dir. FSA, and he said that "I will prevail, but there was still **one person** who was not convinced that I was right and now the contract was being reviewed by a second attorney". I did get my hours back, but only after it took two different attorneys to convince four FSA Managers that they had been doing it wrong. According to the email I received from Mr. Willa, they have been miscalculating its union employee's accruals for over 10 years and Local 1102 had never disputed it before. I was told by David to keep it quiet and not to discuss it with the other union members. By informing the other 1102 members would make FSA look bad because calculating the accruals the way FSA was doing them meant that some employees got more vacation time than what is in the contract (would you complain about that?) and others got shorted hours , like myself. According to Zachary Long, Field Examiner for the National Labor Relations Board, this was Local 1102's first mistake and this should have gone to arbitration. By taking no action, Local 1102 enabled FSA to violate the contract by sweeping this under the rug and leaving the door open to violate the contract again, which FSA did.

I quote what is written in your Shop Stewards Manual under <u>Problem- Solving 101 (pg 6)</u>:

*"If there's a problem and we ignore it, then the union loses credibility, the contract is weakened, and every worker suffers."*

I acknowledged that I had written letters to two members of FSA's Board of Directors as my union contract also reads under <u>**Employer Board Meeting Article 32**</u>:

2

*One Employee, either designated by the Union or elected from the Employees at large, will be entitled to attend Employer's Board of Directors' meetings, exclusive of Executive Sessions. Upon request the executive Director shall give the Employee notice of said meetings and the Employee will, when necessary, be given sufficient time off from employment, with pay, to attend the meetings. However, said Employee will not be allowed to vote on any item before the Employer's Board of directors, **but will be expected to be heard on any items affecting the Employees' working conditions.***

I felt it would be totally inappropriate to attend such a meeting since I was laid off. Since Dr. Baigent is not only the V.P. of Student Affairs, he is the Chancellor's Designee for the Undergraduate Student Government along with being seated on FSA's Board of Directors. This clearly is a "conflict of interest" since the Undergraduate Student Government has a contract with the Faculty Student Assoc. as their fiscal agent and this goes against SUNY Policies. I have made the Interim Vice Chancellor of Finance and Administration, James Van Voorst aware of this conflict and I am enclosing a copy of a letter I received from the SUNY Auditor, Michael Abbott stating that an investigation into my allegations against FSA will be done. I have also contacted The New York State Education Dept. who also said they will look into my allegations.

I am also enclosing a copy of an article from Newsday which encourages an employee (who was also faced with the same breed of aggressive managers that are employed by FSA) to send a letter to the company's Board of Directors. I see nothing wrong with what I did, as I have told nothing but the truth since day one. Where are my first amendment rights?  FSA's whistleblower policy also states that the "Whistleblower protections are designed to provide confidentiality and safeguard **against retaliation**", the only part FSA left out was how FSA's Administrative Staff were exempt from any and all FSA policies. I did not say anything in my statement that was not true. FSA acknowledged and confirmed my accusations and condoned their actions. The only exception is that they denied my allegation of sexual harassment towards two USG female students. Both Dennis and Ryan were present at that meeting on February 29, 2008.

Your statement about the employers having a right to expect loyalty from their employees boggles one's mind. If we were all "loyal employees" there would be no "Whistle Blower" policies, Unions, Dept. of Labor, EEOC, Human Rights, National Labor Relations Board, and Labor Lawyers etc. Aren't "loyalty" and "respect" earned? Where is Local 1102's loyalty to its members that are employed by FSA, when you enable the employer to violate its contract? At the time of my termination I was not employed by FSA and I had the Decision and Award from an Arbitrator and according to the American Arbitration Assoc. that award is supposed to be **"final and binding"**.

3

This do as I say, not as I do, attitude is wrong! Where is FSA's "loyalty" to its client USG? Isn't a fiduciary duty an obligation to act in the best interest of another party?  Charging it's client (USG) under false pretense for legal fees and unemployment benefits due to FSA's own negligence is fraud and is a betrayal of student trust.  I was an employee who was interviewed by the USG students and at the student's request; FSA was instructed to hire me and I was put on FSA's payroll to serve the students and to act in their best interest. Unlike FSA, I was true to my job description and followed the FSA and SUNY Policies and Procedures.

### *The SUNY Policy on Student Activity Fees-Mandatory, Fiscal and Accounting Procedures reads:*

## II Procedures:

*B. The fiscal agent shall deposit all receipts in designated account(s), established solely for student activity fee transactions. Student activity fee money may not be **co-mingled** with monies of the campus or affiliated organizations such as a **faculty student association** (auxiliary services corporation) or voluntary student activity fee funds. **The account custodian shall be the fiscal agent as fiduciary.** With the exception of those organizations for which there is a contract with the student government, or as determined by the **campus designee**, all student organizations recognized by the student government must utilize the accounting and banking accounts of the student government for all of their activity. The campus shall provide to the fiscal agent and student government financial officer, an accounting of projected and actual student activity fee receivables as requested.*

### It also states:

*L. All compensated **employees** of the representative student government should be selected, appointed and provided a work environment consistent with the non-discrimination policies of the University. The employment practices and compensation rates should be consistent with those followed by the University or campus-affiliated organizations. A written non-discrimination policy should be developed, implemented and on file for the representative student government. **The student government should utilize the fiscal agent to administer payroll functions.***

<u>NOTE:</u> The word utilize means that FSA is to be used as a payroll service for USG and not an employer. The problem being, that USG has no employees and this goes against the SUNY policies as this clearly says "**employees of the representative student government**". This was just the easiest way for FSA to control and  manipulate the students and technically speaking, I should not have even been in the union. **This employment set up is also a "conflict of interest"**

**Website:** http://www.suny.edu/sunypp/sort.cfm?doc_typ_id=1,2,5,10&clear=ySuny.edu

As for my post-discharge conduct on August 28, 2008, did anyone from Local 1102 ever ask me what was said or done when I went to speak to Mr. Edwards (not confront)? **NO!** There were witnesses; Mary Howley spoke to me and saw that I was calm and non-combative prior to her leaving Tom and I alone in the USG office. After I left Mr. Edwards, I spoke with Liz Frisenda and I told her that Tom was visibly shaken by my presence. I would be to, if "I had thrown him under the bus" to save myself and he approached me afterward.  The only questions I asked Mr. Edwards, were, could I speak to him and when he said no and called me a "Liar" I asked him

4

if he was _____ kidding me? I did proceed to tell him about a conversation that took place during FSA's conclusion to its investigation into my allegations of their misconduct. He obviously heard what I had to say as this pertained to the $810.50 that was transferred from USG's Bank Account to FSA's Account. I simply told him about a conversation that pertained to him, to inform him that FSA condoned this transfer of money and that Mr. Edwards was mentioned as being partially responsible for the transfer. I found Mr. Edwards dramatic concern for his safety in his email just a little over the top, but also entertaining. I can also picture Chris Oster dictating to Tom to make sure he puts in his email that I had gotten physical with her at my verbal reprimand on January 25, 2008. For the tenth time, I tapped her left arm to get her attention and to stop her from going any further, when she said "What would you like us to do, fire the woman?"

You based your opinion of my conduct that day on the email from Tom. He wrote that "my attitude and demeanor was threatening". You wrote that "I confronted Edwards at the workplace in a belligerent and hostile manner". If you read Tom's email it did not say that, and you were not present to determine what my manner was! What kind of a union takes the side of the employer over the employee? Don't you have a duty to fairly represent your members?

To this day, I am still in disbelief that Mr. Edwards has compromised his integrity to secure his job and turn on me to save himself. This is a dog eat dog situation and I got the brunt of it! In one of my conversations with Mr. Edwards he told me that "just like you have to fight for your job, I have to fight for mine". He also justified his actions by telling me that at least I had Richie (my fiancé) to help me financially and that he had no one. I did write in my letter to Ms. Yearwood-Drury of the NYS Human Rights, that if Mr. Edwards was **"UNDER OATH"** he would not commit perjury. He isn't there yet and if he were to lie under oath, then I really didn't know him after all. It is now obvious to me that Mr. Edwards has no credence when he is not swearing to tell the truth and I would like the opportunity to let an arbitrator make that determination on his own.

At my second arbitration meeting on July 15th, Dennis Romano was able to get Barbara Leigh-Manuell her back pay for her reduction of her hours; I on the other hand got nothing. I told Mr. Romano that FSA either pays me now or they pay me later; as there was talk of a settlement at that point. The settlement should not have even entered the picture as the reduction of Barbara's and my hours were the matter at hand and should have been separate from all other grievances. I had never heard of an arbitration where you have one party in one room and the other in another room. Ryan hadn't even contacted Barbara to make her aware that the arbitration was taking place that day and she was called and had to leave work to attend. Dennis didn't even know about the arbitration hearing and since Ryan was off that day, someone had to call Dennis to come in and represent the union. I have never gotten a straight answer from Dennis as to why FSA refused to pay me. He tap danced around that question and

5

suggested that I could only guess why. Since Zack Long (NLRB, I have a case pending against FSA) had also asked that same question and I couldn't honestly answer it, I told him he would have to ask Dennis Romano for that answer. Later on, in a conversation I had with MR. Long, I asked him if Dennis told him why FSA refused to pay me for the reduction of my hours and he said he was not at liberty to tell me, but he also said I should send a certified letter to the union requesting the answer to that question. Please consider this as my certified letter requesting an answer to why did FSA gave Barbara back pay for her reduction in hours but refused to pay me?

My rights as a shop steward were definitely violated by federal law according the Local 1102 Shop Steward manual. I was also warned by Tom Edwards just a day or two before my verbal reprimand, on January 25, 2008 to be careful of what I say and do as **we were all being watched**. I relayed this message to Mary Howley and she can confirm that I told her that. I am also concerned about the change in the contract that was agreed upon on July 15th. My concern lies with:

*In addition to Head Bookkeeper, there shall be two other classifications of Bookkeeper to be incorporated into Schedule A of the Collective Bargaining Agreement, as follows, (1) Bookkeeper-FSA and (2) Bookkeeper-USG*

FSA will interpret this to mean that even though Bookkeeper-FSA has less seniority than Bookkeeper-USG, Bookkeeper-USG's hours can be cut with no effect on Bookkeeper-FSA. This contract is clearly a contract of convenience for FSA. I see that Mary Davis who originally was hired as a Bookkeeper and has less seniority than Barbara and I have, was given a new title of Head Bookkeeper. Giving her this title is like giving an immunity necklace to someone playing Survivor. We are clearly **isolated** from other union workers, as some work at the hospital; some at Jasmine. By putting this revision of Bookkeeper-FSA, Bookkeeper-USG, in the contract you have drawn a territorial line for the bookkeepers covered under this agreement. This maneuver was a good strategy on FSA's part and Local 1102 fell right into it.

You were also unaware that FSA was assigning titles to employees that were not even listed on the contract. I for one was originally hired as an Accounting Clerk which does not exist under Schedule "A". Does one hand know what the other hand is doing or do we just make up new rules as we go along? Again, this is a contract of convenience and since there were no provisions for an Accounting Clerk when I was hired, should I have even been put in the union?

Now for **grievance number four**, my discharge:

Your letter of September 12, 2008 puts in writing that FSA was offering me a settlement of $25,000.00 in exchange for a General Release of all claims against them and the union **"strongly suggests I reconsider FSA's offer"**. Just like all the legal fees for arbitration and advisement that FSA has already passed onto USG, I know where that money would most likely come from and that would be the Student Activity fees. An audit of USG's and FSA's books will prove that. My

answer to Dennis was: $25,000 doesn't buy justice it just buries it! This offer is an obstruction of justice and I consider it "hush money" and it would be at the expense of the Stony Brook University students and their parents. Unlike FSA, I have a conscious!

I do read the RWDSU record and have seen other union members that were in similar disputes with their employers and they have won in arbitration. I didn't know that it would be the luck of the draw at arbitration and I sometimes wonder if I was in the wrong union or had the wrong arbitrator. I had confidence in my union, as Dennis had informed FSA not to make him have to subpoena their records, since his request for documents (Rudolph Migliore's (USG's attorney) letter, etc.) were denied and that was never done. He also let me down when Eric LaRuffa missed my first pre-arbitration meeting because his car got towed away in NJ and Dennis was not available the next day to sit in on the meeting. Now that I have mentioned the RWDSU record I would like to remind you about a comment you made and I quote "With a contract, management has to put its promises in writing, and can't hide from their obligations to employees." My experience is that the Local 1102 members employed by FSA have nothing but a bunch of broken promises and a contract that isn't worth the paper it is written on. Even one of your own lawyers commented on how loose the contract was and it needed to be cleaned up. When dealing with an employer like FSA, you need to dot all i's and cross all t's, a generic, one size fits all contract leaves too much room for interpretation.

I am requesting that you reconsider going to arbitration to defend my discharge. My clock is running out as I have 6 months from the date of your rejection letter to file a claim with the National Labor Relations Board. I will reciprocate the time limit that I was allowed to respond and I would like to have a yes or no answer that another arbitration is in my future along with the truth as why FSA refused to give me back pay for the reduction of my hours. I would appreciate this in writing by Friday, February 6, 2008. My email address is on the first page of this letter. I think I have made myself very clear in the role that Local 1102 played in my termination. I was not only provoked by my employer and was working in a hostile environment, but chastised, harassed and retaliated against for doing my job as a shop steward.

Very truly yours,

Gayle Freese

Cc: Jame Van Voorst- Interim VC Finance and Administration
   Douglas Panico- Office of Management Analysis & Audit

7

**EXHIBIT H**

# The Constitution of the
# Undergraduate Student Government

*As adopted on April 4th, 2003*
*As amended on May 13th, 2004*
*As amended on April 30th, 2005*
*As amended on February 10th, 2006*
*As amended on October 27th, 2006*
*As amended on November 17th, 2006*

**Preamble**

The Undergraduate Student Government at Stony Brook University is an autonomous unit within the University Community and it derives its power from the Undergraduate Student Body of said University. Undergraduate Student Government shall work closely with the University Administration to foster a spirit of community, diversity and fellowship, to create programs and services for the benefit of all members of the campus community. The Undergraduate Student Government shall provide leadership that will ensure the undergraduate student voice will be a powerful force in all decisions made at Stony Brook and hereby establish this constitution of the Undergraduate Student Government.

**Article I:    NAME**

This organization shall be known as the Undergraduate Student Government at Stony Brook University, to be referred to as the Undergraduate Student Government.

**Article II:    MEMBERSHIP AND ORGANIZATIONAL STRUCTURE**

**Section 1    Membership**

All undergraduate students at Stony Brook University shall be members of the Undergraduate Student Government.

**Section 2    Organization Structure**

A. The Undergraduate Student Government shall be comprised of the Executive Branch, a Legislative Branch, and a Judicial Branch.

B. Said organization is organized exclusively for charitable, religious, educational, and scientific purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt organizations under Section 501 (c) (3) of the Internal Revenue Code, or corresponding section of any future federal tax code, and the making of distributions to organizations that qualify for funding under the SUNY Chancellor's Guidelines.

C. No part of the net earnings of the organization shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that the organization shall be authorized and empowered to pay reasonable compensation of services rendered and to make payments and distributions in furtherance of the purposes set forth in the purpose clause hereof. No substantial part of the activities of the organization shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the organization shall not

participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this document, the organization shall not carry on any other activities not permitted to be carried on (a) by an organization exempt from federal income tax under section 501 (c) (3) of the Internal Revenue Code, or corresponding section of any future tax code, or (b) by an organization, contributions to which are deductible under section 170 (c) (2) of the Internal Revenue Code, or corresponding section of any future federal tax code.

D.  Upon the dissolution of the organization, assets shall be distributed for one or more exempt purposes within the meaning of section 501 (c) (3) of the Internal Revenue Code, or corresponding section of any future federal tax code, or shall be distributed to the federal government, or to a state or local government, for a public purpose. Any such assets not disposed of shall be disposed of by the Court of Common Pleas of the country which the principal office of the organization is then located, as said Court shall determine, which are organized and operated exclusively for such purposes.

**Section 3    Equal Opportunity, the Proper Distribution of the Student Activity Fee, and Clubs and Organizations Rights**

A.  No person, having qualified for the Undergraduate Student Government membership in the manner prescribed in Article II, Section 1.A. of the Constitution of the Undergraduate Student Government Constitution shall be denied the rights and privileges of Undergraduate Student Government membership on the basis of race, religion, sex, color, national origin, age, marital status, disability, or sexual orientation.

B.  No Club, Organization, or entity shall be denied the right to funding from the Undergraduate Student Government on the basis of belief, philosophy, creed, opinion, religion, or political persuasion.

C.  No Club, Organization, or entity recognized by the Undergraduate Student Government and guaranteed the right to funding shall be denied the right to use its funding to carry out its mission, goals, and activities.

D.  All Clubs, Organizations, and entities recognized by the Undergraduate Student Government are guaranteed the same criteria for student-based funding provided that the club serves the University's mission, fosters the growth of communities, is open to all members of the Undergraduate Student Government, and is fiscally responsible. Funds shall be used for educational, academic, cultural, recreational, athletic, or social activities, events, and publications which contribute to the marketplace of ideas, serve the community, and advance the mission, goals, and activities of the club recognized.

E.  The Student Activity Fee must be distributed in a viewpoint neutral manner and with equal protection under law afforded to all Clubs, Organizations, or entities recognized by the Undergraduate Student Government.

F.  The Undergraduate Student Government shall make no law or policy establishing separate criteria for receiving funding, including on the basis of the viewpoint of the Club, Organization, or entity recognized, the types of beliefs and opinions which are being expressed, or the manner in which those ideas are being distributed.

G.  This Section shall not be construed to mean that funding levels shall be equal for all Clubs, Organizations, and entities. Any Club, Organization, or entity recognized by the Undergraduate Student Government and guaranteed the right to funding shall operate with an

appropriate level of funding by the Undergraduate Student Government to function effectively in carrying out its mission, goals, and activities. The Undergraduate Student Government shall take into consideration the Club, Organization, or entity's duly adopted constitution, the written plan for expenditure of allocated funds, the past record of the Club, Organization, or entity's utilization of its allocations, the number of students served by the funded activities of the Club, Organization, or entity, whether the Club, Organization, or entity is in good standing with the Undergraduate Student Government, and considerations of fiscal prudence. This decision may be appealed to the Judicial Branch of the Undergraduate Student Government.

H.   The enumeration in this Section of certain rights shall not be construed to deny or disparage others retained under law by all Clubs, Organizations, and entities or the students. The Senate shall have power to enumerate and define those rights retained under law consistent with all articles in this Constitution.

I.   No club, organization, or entity shall be denied the right to engage in the free exercise of religion or politics; or of the right to the freedom of speech, or of the press; or the right to peaceably assemble, and to petition any Government for a redress of grievances in accordance with established University policies. These rights are guaranteed to all clubs, organizations, or entities recognized by the Undergraduate Student Government.

J.   Published, broadcast, electronic or otherwise distributed media on behalf of any club, organization, or entity recognized by the Undergraduate Student Government shall be acknowledged and treated as a product of free speech, guaranteed to all people under the New York State and United States Constitutions. Such speech, press, or media shall be granted the same rights given to student media regardless of viewpoint.

K.   The Undergraduate Student Government may not make any attempt to control or enforce unconstitutional powers on a club, organization, or entity. This includes all matters of free speech, expression, message content, viewpoint, and press distribution.

**Article III:   EXECUTIVE BRANCH**

**Section 1   Executive Council**

The Executive Board of the Undergraduate Student Government shall be known as the Executive Council.

A.   **Membership**

1.   The voting members of the Executive Council are:

a.   President  –  Joseph Antonelli

b.   Executive Vice President –  Nathan Shapiro

c.   Treasurer  –  Leonard Wright III

d.   Vice President of Communications and Public Relations – Jonathan Hirst

e.   Vice President of Student Life, Programming and Activities – Juvanee Bedminster

f.   Vice President of Clubs and Organizations  – Jeffrey Akita

g.   Vice President of Academic Affairs – Tae Soo Kim

h.   Class Representatives

i. Freshman – Kadeem Hylton
ii. Sophomore – Anwar Adeel
iii. Junior
iv. Senior – Gabrielle Robergeau

2.   Ex-officio members:

a.   A Faculty Advisor, selected jointly by the President, the President Pro Tempore, and the Chief Justice.

b.   Executive Director of the Undergraduate Student Government.   Eunice Ro

## B.   Voting Members Qualifications

1.   The President, Executive Vice President and Treasurer – before placement on the ballot, candidates must be full-time matriculated undergraduates with sophomore or higher standing, must be a member of the Undergraduate Student Government, must have attended Stony Brook for at least two semesters, and must be in good academic standing with minimum grade point averages of 2.75. The same criteria must also be maintained during their term of office.

2.   All other members of the Executive Council - before placement on the ballot and taking office, candidates must be full-time matriculated must be a member of the Undergraduate Student Government and except for the freshmen class representative, must have attended Stony Brook for at least one semester, and must be in good academic standing with minimum grade point averages of 2.5. The same criteria must also be maintained during their term of office. The class representative senators shall serve as voting members of the Undergraduate Student Government Activities Board.

## C.   Candidacy Period, Election and Term of Office

1.   **Candidacy Period**

a.   All candidates must go through a series of leadership workshops relevant to the positions they are seeking before being placed on the ballot for elections.

b.   The Faculty Advisor, the Executive Director and the Elections Board shall coordinate the leadership workshops. An outside office/department may be utilized to help facilitate the workshops.

2.   **Elections**

a.   The voting Members of the Executive Council shall be elected before the last day of classes in the Spring semester, except for the Freshman Representative who shall be elected by October 31st.

b.   Members of the Executive Council are elected by a simple majority (fifty percent plus one) of votes cast for that position in the Undergraduate Student

Government general elections. In the event that no candidate receives a simply majority of the votes cast, then a run-off election shall be held between the top two candidates. Procedures for elections are further detailed in the Election Board Bylaws.

c.   As indicated on the ballot, the duly elected President shall serve as the elected Stony Brook Council Representative in the year there is to be an undergraduate representative to the Stony Brook Council.

d.   Vacancy

   i.   In the event that the seat of any officer shall become vacant, except the President, before or on October 31st, the Student government shall conduct an election to fill the vacant seat.

   ii.   In the event of a vacancy of the seat of any officer, except the President, after October 31st, the President shall appoint a new officer within two weeks of the occurrence of the vacancy to serve out the unexpired term.

   iii.   The vacant seat of the President shall be filled by the Vice President. The seat of the Vice President shall then become vacant and must be filled by the procedures mentioned in subsections i. and ii.

3.   **Terms of Office**

a.   The term of office for the elected officers shall begin from the end of the Spring semester, and shall continue until the end of the following Spring semester.

b.   The elected officers shall maintain good academic standing, as defined under Article III, Section 1. B. 1., throughout their term of office.

c.   All officers must fulfill the minimum of fifteen hours of service each week, and said office hours must be publicly posted.

d.   All Executive Council officers shall be awarded a flat stipend for their services and the award should amount to no less than the minimum wage per hour.

e.   Stipends are paid only for the first fifteen hours of work per week.

D.   **Meetings**

1.   All meeting of the Executive Council must adhere to the New York State Open Meetings Law.

2.   The Executive Council shall meet at least once every two weeks.

3.   The President may also call meetings, whenever any member deems necessary, providing that those meetings adhere to the New York State Open Meetings Law.

4.   Quorum is necessary for all Council meetings to be official. Quorum shall be defined as a simple majority of elected seats.

E.    **Executive Council Members Duties and Responsibilities**

1.    **President**

a.    Shall be the Chief Executive of the Undergraduate Student Government.

b.    Shall be ultimately responsible for ensuring that the Undergraduate Student Government is operating properly and according to established legislation.

c.    Shall ensure that all the Undergraduate Student Government agencies are fulfilling their created purpose.

d.    Shall be the official representative and spokesperson of the Undergraduate Student Government both inside and outside Stony Brook University.

e.    Shall supervise the execution of the legislation of the Undergraduate Student Government, and conform to established policies and procedures to carry out this task.

f.    Shall receive the names and qualifications of nominees for Parliamentarian from the University Ombudsperson. Shall appoint a Parliamentarian for the Senate, subject to the approval of the Senate, by the second Senate meeting of the Fall semester. The Parliamentarian shall not be a present student at Stony Brook University.

g.    Shall have the power to veto any bill of the Senate according to the procedure provided for in Article IV, Section 1.C.4.

h.    Shall make all appointments within the Undergraduate Student Government in consultation with the President Pro Tempore of the Senate.

i.    Must consult with the Executive Council in the fulfillment of the powers and duties outlined above.

j.    Shall be a voting member of the Executive Council.

k.    Shall make at least one written scheduled report per semester to the Senate and the Student Body on the state of the USG.

l.    Shall ensure that the Undergraduate Student Government is adequately staffed with professional employees and shall be the official supervisor of the support staff on behalf of the Executive Council, unless otherwise noted.

m.    Shall be a non-voting member of the Senate.

2.    **Executive Vice-President**

a.    Shall assume the duties of the President in her/his absence.

b.    Shall assist the President in coordinating the operations of the Executive Branch.

c.     Shall represent the President on occasions designated by the President.

d.     Shall be the Chair and set the agenda for Senate meetings.

f.     Shall fulfill those powers and duties delegated to him/her by the President.

g.     Shall work closely with the Executive Director of the Undergraduate Student Government.

h.     Shall have the responsibility for all official records and correspondence of the Executive Council, the Senate and the Undergraduate Student Government shall be the responsibility of the Executive Vice President.

i.     In conjunction with the Executive Director, the Executive Vice President shall coordinate the clerical and administrative services of the government, to include the recruiting, training, and development of administrative and clerical staff and services.

j.     Shall coordinate all Presidential appointments, unless otherwise stipulated.

k.     Shall work closely with the Executive Director in the area of human resources and its development.

3.     **Treasurer**

a.     Shall be the Chief Budgetary Officer of the Undergraduate Student Government.

b.     Shall be responsible for all budgetary/fiscal matters of the Undergraduate Student Government.

c.     Shall be a voting member of the Executive Council.

d.     Shall be responsible for the preparation of the annual budget of the Undergraduate Student Government.

e.     Must submit a report on the state of the finances of the Undergraduate Student Government to be presented to the Senate at least once each semester. Such report should also be disseminated to the student body, with the assistance of the Vice President of Communications and Public Relations.

f.     Shall chair the Senate Budget Committee.

g.     Shall ensure that the Undergraduate Student Government monies are not mishandled and shall review any Undergraduate Student Government operation whenever he/she determines that such an audit is necessary.

h.     Shall make certain that a strict inventory is kept on all furniture, equipment, etc. of the Undergraduate Student Government. All capital assets and equipment purchased/ owned by fee funded groups are part of the inventory for which the treasurer has responsibility.

i.  Shall communicate to all the Undergraduate Student Government funded groups' treasurers of any changes in budgetary policies and procedures. Such communication is to be done with the assistance of the Vice President of Communications and Public Relations.

j.  Shall work closely with the designated custodial and disbursement agent in expending the Student Activity Fee.

k.  Shall hire the necessary student staff to assist in the fulfillment of her/his roles.

l.  Shall be a non-voting member of the Senate.

4.  **Vice President of Communications and Public Relations**

a.  Shall be responsible for all communications or the dissemination of information within the Undergraduate Student Government. The foregoing includes the dissemination of information to the members of the Undergraduate Student Government and/or its recognized groups.

b.  Shall record and distribute the minutes of the Executive Council meetings.

c.  Shall review and distribute the Senate minutes in cooperation with the Senate Recording Secretary.

d.  Shall be in charge of public relations of the Undergraduate Student Government.

e.  Shall fulfill those powers and duties delegated to him/her by the President.

f.  Shall set up an Office of Communications to assist in the fulfillment of her/his roles.

g.  Shall be the chair of the Bureau of Media Groups, and shall facilitate and, if necessary, coordinate the activities of that group.

h.  Shall be a non-voting member of the Senate.

5.  **Vice President for Student Life, Programming and Activities**

a.  Shall be responsible for addressing student life issues.

b.  Shall organize any task force, committees, or ad hoc positions necessary to assisting in addressing student life issues.

c.  Shall work closely with the Office of the Vice President for Student Affairs to further understanding of the current issues affecting student life. Shall be the Undergraduate Student Government liaison to that office.

d.  Shall sit on any Undergraduate Student Government and/or University committee to address student life issues.

e.  Shall be the chief programming officer of the Undergraduate Student Government. Shall therefore oversee the Student Activities Board of the Undergraduate Student Government.

f.  Shall advise the Executive Council and the Senate on policy or legislative initiatives that will help enhance programming on campus.

g.  Shall be the Undergraduate Student Government representative on any committees formulated to address programming issues on campus.

h.  Shall work closely with the Student Union and Activities Office to formulate policies in accordance with the optimal support for student planning and activities.

i.  Shall ensure that diversity is reflected in the programs and activities organized under the student activity fee, and that all programs and events are open to the entire student body.

j.  Shall be the chair of the Bureau of Programming Groups, and shall therefore coordinate the activities of that Bureau.

k.  Shall be a non-voting member of the Senate.

6.  **Vice President for Clubs and Organizations**

a.  Shall strive to ensure that the Undergraduate Student Government recognized groups abide by the policies and procedures of the University and/or the Undergraduate Student Government. Shall therefore communicate changes in policies to the recognized groups.

b.  Shall act as a liaison between the Undergraduate Student Government, and its recognized student groups, thus ensuring a strong working relationship.

c.  Shall meet with all club/organization Presidents at least once per semester.

d.  Shall ensure the continuous training and development of Club's and Organization's officers.

e.  Shall be a non-voting member of the Senate.

7.  **Vice President of Academic Affairs**

a.  Shall coordinate all Undergraduate Student Government operations in the area of academic policy.

b.  Shall be the Undergraduate Student Government representative on all University policy-making bodies that have jurisdiction undergraduate academic affairs. Shall find alternative or additional student representation when needed.

c.  Shall be the Undergraduate Student Government liaison to faculties and the administration.

d.  Shall create and maintain policies that will ensure that the Undergraduate Student Government is effectively responding to academic issues affecting its undergraduate membership.

e.  Shall ensure that faculty members that are making strong contributions to student development, inside and outside the classroom, are recognized for this.

f.  Shall be the chair of the Bureau of Academic Groups and shall therefore coordinate the activities of that Bureau.

g.  Shall be a non-voting member of the Senate.

8.  **Class Representatives**

a.  The following class representatives shall be responsible for representing the classes' interests to the Undergraduate Student Government, to plan appropriate programs to meet the needs of their constituents and shall chair the appropriate Bureaus groups, as follows:

i.   Senior Class Representative- Bureau of Cultural Groups.
ii.  Junior Class Representative- Bureau of Service Groups.
iii. Sophomore Class Representative- Bureau of Advocacy Groups.
iv.  Freshman Class Representative- Bureau of Athletic Groups.

b.  Shall serve as non-voting members of the Senate.

**F. Duties and Responsibilities of the Executive Council.**

1.  In the interest of the Undergraduate Student Government members, to promote and sponsor a range of social, cultural, educational and service programs.

2.  To further the benefits and privileges of the undergraduate student body at Stony Brook.

3.  To ensure that the Student Activity Fee is properly allocated and disbursed in accordance with Chancellor's guidelines, University Policy and considerations of fiscal prudence.

4.  To act as a liaison between the students and Administration.

5.  To develop additional measures to fulfill all policies, procedures, and legislation of the Undergraduate Student Government.

6.  Shall delegate additional duties to already established agencies of the Undergraduate Student Government, unless otherwise stated in the Constitution or General Bylaws of the Undergraduate Student Government.

7.  To review and approve, by two-thirds vote of filled seats, any agency operations manual.

8.  May, at their discretion, hire and maintain a professional staff to assist them in the administering of the Student Activity Fee, overseeing the daily functions of the organization, and maintaining a student friendly environment. Said staff hiring must

adhere to the AA/EEO standards. All personnel issues are deemed administrative and therefore within the realm of the Executive Council. Any termination or other decisions regarding professional staff must be decided by a simple majority vote of filled seats of the Executive Council. All full-time professional staff are to be contracted for a period not exceeding 2 years, subject to renewal as specified in the bylaws.

**Section 2        REPRESENTATIVES TO OTHER ORGANIZATIONS**

A.     **Faculty Student Association Representatives**

1.     There shall be three student representatives on the Board of Directors of Faculty Student Association. One representative shall be a member from the Executive Council of the Undergraduate Student Government designated by the President of the Undergraduate Student Government. The other two representatives shall be elected from the Senate according to the FSA bylaws, provided that one of the three is a commuter student and one is a resident student.

2.     They shall represent the undergraduate student concerns before FSA that specifically relates to the functions of that corporation.

3.     They shall act as the Undergraduate Student Government liaison to FSA.

4.     Terms of office of the representatives shall be two academic years starting with the Fall Semester following the election.

B.     **State University of New York Student Assembly Delegates**

1.     The New York Student Assembly consists of representatives from all the SUNY campuses.

2.     Each SUNY campus is allotted one delegate one vote for every 4,000 full-time students during a meeting of the NYSSA.

3.     The President of the Undergraduate Student Government shall be one of the delegates to the New York State Student Assembly.

4.     The President shall appoint respectively, with 2/3 approval of the Senate, one additional delegate from the Executive Council, one from the Senate, and one from the Judiciary.

5.     NYSSA Delegates shall represent the needs and concerns of the Undergraduate Student Government members to the elected representative of NYSSA, who holds a seat on the board of Trustees.

C.     **Stony Brook Council Representative**

1.     In fulfilling the requirement of New York State Education Law, the President of the Undergraduate Student Government, by the authority vested in him/her by the election shall also serve as the undergraduate representative on the Stony Brook Council, as indicated on the election ballot, on alternate years when this position is not filled by a graduate student.

2.      The representative shall serve from July 1st to June 30th, following the election.

3.      The President shall provide a report to both the Executive Council and the Senate on the proceedings of the Stony Brook Council meetings as soon as practical after each Stony Brook Council meeting.

**Section 3      Undergraduate Student Government Agencies**

A.      The Undergraduate Student Government shall create agencies to fulfill the following functions:

1.      The President may create agencies within the Undergraduate Student Government, according to established legislation.

2.      An agency may be independent, quasi-independent, or joint.

   a.      An independent agency is one that is not aligned with the Legislative or Executive Branch of the Undergraduate Student Government. There is limited reporting to either branch, but the President is ultimately responsible for ensuring that agencies under this category are functioning properly.

   b.      A quasi-independent agency reports to the President. The President is responsible for ensuring that all agencies under this category fulfill their duties and responsibilities. The Executive Vice President may be delegated the supervision of these agencies.

   c.      Joint agencies are agencies created both by the President and the Senate, and should be defined as such. The President is responsible for the proper functioning of these agencies. The agencies should also submit reports to the Senate, at least once per month, regarding their duties and responsibilities.

3.      The chairs of all agencies shall, except for the Vice Presidents who serve as heads of agencies, be appointed by the President and approved by the Senate, by majority vote.

B.      **Agencies**

1.      **The Elections Board**

      The Elections Board, an independent agency, shall ensure that all elections within the Undergraduate Student Government are operated properly and fairly, according to established legislation, policies, and procedures.

2.      **Undergraduate Student Government Activities Board**

      The Undergraduate Student Government Activities Board, a quasi-independent agency, shall provide quality programs and events on behalf of the Undergraduate Student Government, and shall ensure that the Undergraduate Student Government and its respective organizations are doing the same.

   a.      The Vice President for Student Life, Programming and Activities, and the Board shall ensure that diversity is reflected in the programs provided by the Board, taking special account of the needs of the various cultural and special interests clubs and organizations.

b. In its programming the Board shall take special account of the needs and desires of the various cultural and other special interests clubs and organizations on campus.

c. The Board shall form a Committee on Cinematic Arts (C.O.C.A) that shall provide film services to the undergraduate student body in accordance with the duly established Student Activities Board by-laws.

3. **Audio/Visual Board**

Audio Visual, a quasi-independent agency, shall provide audio and visual services to the Undergraduate Student Government and clubs/organizations.

4. **Undergraduate Student Government Events Management Staff**

The Undergraduate Student Government Events Management Staff, a quasi-independent agency, shall provide events management services to the Undergraduate Student Government and clubs/organizations.

5. **Stony Brook University Television**

Stony Brook University Television, a quasi-independent agency, shall provide media services to the Undergraduate Student Government and its members.

6. **Specula**

Specula, a quasi-independent agency, shall provide yearbook services to the Undergraduate Student Government and its membership.

7. **Special Services Council**

The Special Services Council, a joint agency, shall review and approve/disapprove groups seeking the Undergraduate Student Government recognition. The Special Services Council may also provide, on request, additional funding to individuals, clubs or organizations for special events.

a. The approval given by Special Services Council shall be considered as probationary recognition. Probationary recognition shall last for a minimum period of one academic year, during which the group will get its funding from the Special Services Council budget. Clubs and organizations may appeal the decision of the Special Services Council according to procedures defined in the Special Services Council operations manual.

b. Groups may request full Undergraduate Student Government recognition from the Senate after their minimum probationary period. A two-thirds affirmative vote of the filled seats of the Senate is required for full student government recognition upon recommendation from the Special Services Council. Upon full recognition such an approved group will be granted a position on the line budget.

C. **General Duties and Responsibilities**

1.   Agencies are to perform according to the specific purpose for which they were established.

2.   May recommend to the Executive Council possible revisions to their respective operations manual.

3.   Specific duties and responsibilities are set in each agency's operations manual. Those operations manuals are considered a part of the Executive Council policies and procedures.

4.   The Executive Council may delegate additional duties and responsibilities to the agencies, unless otherwise stated in the Undergraduate Student Government Constitution or General Bylaws.

**Article IV:    LEGISLATIVE BRANCH**

**Section 1    Senate**

**A.    Membership**

1.   The Executive Council

   a.   The Executive Council members, except the Executive Vice-President, are non-voting members of the Senate with full speaking privileges. They shall be included in all executive sessions unless the session is for the purpose of assessing a prospective disciplinary action against a particular member of the Executive Council at which time that member will be excluded.

   b.   The Executive Council members, who chair the various Bureaus, shall represent those Bureaus under their responsibility in the Senate as non-voting members.

   c.   The Faculty Advisor and Recording Secretary shall serve as non-voting members with limited speaking rights, in the Senate.

   d.   The Executive Council Members who are chairs of the Bureaus shall be voting members of the relevant Budget Committee.

2.   The Senate shall be presided over by the Chair who shall be the duly elected Executive Vice President. The newly elected Senate during their first official meeting shall select a President Pro Tempore and a Recording Secretary, and both officers must be present for the next Fall semesters. The President Pro Tempore shall preside over the Senate in the absence of the Chair. In the absence of both the Chair and the President Pro Tempore, the Senate shall not be permitted to hold a meeting.

3.   The remaining senate membership shall be elected by the following method.

   a.   The President or her/his designee of the Commuter Student Association shall be the senator representing the Commuter Student Association.

   b.   The President or her/his designee of the Residence Hall Association, an independent student association, shall be the senator representing the Residence Hall Association.

c.   Twenty representatives elected from each of the following Colleges, in proportion to the number of undergraduates in each college. Each College is to have at least one representative.

  i.  Health Science Center Undergraduates

  ii.  College of Engineering and Applied Sciences

  iii.  College of Arts and Sciences (including students not enrolled in any of the above listed Colleges)

**B.  Election and Term of Office**

1.  Elected senators shall be elected in the following manner:

  a.  Senators receiving the highest total number of votes from their constituency shall be elected to the Senate.

  b.  Should seats be vacant on or before October 31st, the Student Government shall conduct an election to fill the vacant seat(s).

  c.  Should the seat(s) be vacant after October 31st, the President of the Student Government and the President Pro Tempore of the Senate shall appoint the remaining membership.

2.  Senators shall be elected before Spring Commencement for the next academic year. The term of a Senator shall be from the beginning of the Fall Semester until the end of the Spring Semester of the academic year, with the exception of the President Pro Tempore, who shall serve until the beginning of the following Fall semester when a new President Pro Tempore is elected. Senators who have filled vacancies shall serve until the end of the Spring Semester.

3.  Senators must be matriculated undergraduates, must be a member of the Undergraduate Student Government, and must be in good academic standing with minimum grade point averages of 2.5 and a minimum of 6 class credits each semester. These criteria must be maintained during their term of office.

4.  Senators may only represent one constituency in the Senate as defined in Article IV, Section 1A.

5.  Prospective Senators must intend to be a student of the University for the full school year during the term of office.

6.  The Elections Board of the Undergraduate Student Government, with the assistance of the Executive Vice President, shall ensure that the all of the above is properly adhered to.

**C.  Duties and Responsibilities of the Senate**

1.  The primary role of the Senate is promulgate legislation beneficial to and in the best interest of the University's Student population, and to work closely with the Executive Council to ensure that legislation is properly implemented.

2. The Senate shall have the power to write legislation by a simple majority vote of the filled seats of the Senate. Senate legislation shall include, but not be limited to, any by-laws of the Executive Council, the Senate, or Judiciary.

3. A student or undergraduate entity, may call for a special bill to be brought to the floor of the Senate by presentation to the Chair of the Senate of a petition containing the signatures of not less than 1% of the total membership of the Undergraduate Student Government.

4. Every bill which shall have passed the Senate shall, before it becomes a law, be presented to the President following the adjournment of the Senate meeting which passed it; if he or she approve, he or she shall sign it; but if not, he or she shall return it, with his or her objections, to the Senate, who shall enter the objections at large on their journal, and proceed to reconsider it. If any bill shall not be vetoed by the President by its next scheduled meeting of the semester, the same shall be a law, in like manner as if he had signed it, unless the Senate by their adjournment prevent its veto, in which case it shall not be a law. The Senate may override a Presidential veto of legislation by a two-thirds vote of those present. This must be done within two consecutive meetings after the veto has been announced. The vetoed bill will appear under old business on the agenda, with "Presidential Veto Exercised" next to it.

5. Any Senate decision to override the veto can be overturned by a simple majority vote of the ballots cast in a general election.

6. The Senate shall have the power to write resolutions, which shall be enacted by a simple majority vote. A resolution shall be defined as an expression of the will of the Senate; it is not binding, and cannot be vetoed.

   a. Simple resolutions may be enacted on issues of importance to the undergraduate student body in regards to academic policy, student rights, and student welfare.

   b. The Senate may review any policy or procedure enacted by the Executive Council. The Senate may enact "force resolutions" relevant to those policies and procedures, to express its approval or disapproval. A "force resolution" is an expression of the will of the Senate about any policies and procedures enacted by the Executive Council. It outlines to the Executive Council the Senate's will and why it is for or against those policies and procedures. Since a resolution is not generally binding, policies and procedures may only become void if they violate legislation. That violation, if any, should be clearly expressed in the resolution. Policies and procedures of the Executive Council shall include any operations manual of agencies within the Undergraduate Student Government.

7. Shall create ad hoc positions, task forces, and committees to take action on issues of importance to students.

8. Shall review the operations of all organizations recognized and funded by the Undergraduate Student Government.

9. Shall review and approve, by two-thirds vote of filled seats, the budget of the Undergraduate Student Government.

10. Shall approve or disapprove clubs/organizations requests for additional funding, taking into account relevant recommendations from the Budget Committee. All additional funding requests must first go to the Budget Committee, which then makes recommendations to the Senate whether to approve or disapprove.

**D.    Duties and Powers of the Senators**

1. All duly elected senators must complete a training of parliamentary procedures and other relevant leadership skills prior to the first meeting of the Senate.

2. Shall investigate and represent the concerns and opinions of the constituency he/she represents. The Senator shall bring those concerns to the Senate to be addressed appropriately.

3. Shall participate in the functions and responsibilities of the Senate including, but not limited to, Senate meetings, a minimum of two office hours, standing committees, and budget subcommittee meetings.

4. Voting members of the Senate must serve on at least one budget subcommittee and one of the standing committees for the duration of their term.

5. Shall present a brief verbal report to the Senate at least once a month. Only one Senator from the same constituency shall make such a report, with all others submitting a written report to the Chair of the Senate.

6. The class representative senators shall serve as voting members of the Undergraduate Student Government Activities Board.

**E.    Meetings**

1. The Senate shall meet at least twice per month during Fall and Spring semesters with exceptions for Summer semester, vacations and breaks.

   a. A quorum is necessary for any meeting to be conducted. A quorum shall be defined as the presence, in person or by written, signed and validated proxy, of a simple majority of the filled voting seats of the Senate.

   b. All meetings shall be held in accordance with the New York State Open Meetings Law.

2. The Executive Vice President of the Undergraduate Student Government, the Chair, shall preside over the Senate. The Chair may only vote to break a tie. In the absence of the Chair, the President Pro Tempore shall preside over the Senate.

   a. The President Pro Tempore shall be annually elected by the second Senate meeting of the Fall semester by a simple majority vote of filled seats. The President Pro Tempore shall be elected from among the current Senators.

   b. Powers Reserved to the Chair:

      i. The Chair has the final say on any procedural issue in the chamber, and the right to make decisions on matters of procedure. The only power

denied to the Chair is to reject a Motion to Appeal the Decision of the Chair, after it has been seconded.

ii.    All meetings of the Senate shall conform with Robert's Rules of Order, which includes that a Parliamentarian always be present, as specified in Article III, Section 1.E.1.f.

iii.   All procedural decisions of the Senate shall be enforced by a Sergeant at Arms, as outlined in the bylaws.

iv.    The Chair shall designate (subject to the unanimous consent of the Senate) a time for the training of all senators on Robert's Rules of Order before the first meeting of the Senate. Senators not in compliance with this order will relinquish their voting rights until said compliance is achieved.

F.    **Committees**

1.    There shall exist two types of committees within the Senate as follows:

a.    **Standing Committees:**

i.    These committees are permanent Committees.

ii.   Members of these committees shall be appointed according to a process developed by the Executive Vice President and the President Pro Tempore.

iii.  All proposed legislation must first go through a relevant Standing Committee before the Senate votes on that legislation.

iv.   The following Standing Committees shall exist within the Senate.

1.    Legislative Review Committee
2.    Academic Affairs Committee
3.    Elections Committee
4.    Programming and Activities Committee
5.    Rules Committee
6.    Referendum Standards Committee
7.    Budget Committee

v.    New Standing Committees can be established within the Senate through the amendment procedure stated in Article XI.

vi.   The duties and responsibilities of all the above committees are given in the General Bylaws of the Undergraduate Student Government.

b.    **Ad-hoc Committees**

i.    These committees are appointed for a limited purpose and time, not to exceed one academic semester.

ii.   Ad-hoc committees can be established by a simple majority vote of the Senate.

**Article V:    JUDICIAL BRANCH**

**Section 1        Structure**

A.      The Judicial Branch shall be known as the Judiciary.

B.      There shall be two levels of courts; they shall be known as the Supreme Court and the Judicial Council.

**Section 2        Supreme Court**

A.      **Appointment of Justices**

1.      The President shall nominate and appoint the Justices subject to confirmation by a simple majority of those present and voting at the Senate, except the Chief Justice, who shall require a two-thirds majority of those present and voting to be confirmed.

2.      Appointments should be made before the Spring Commencement for the next academic year.

3.      In addition to the Chief Justice, there shall be six Associate Justices.

B.      **Criteria for the Justices**

1.      The Justices shall be full-time, matriculated students.

2.      The Justices shall have and maintain a minimum GPA of 2.5 at the time of nomination and during their term of office.

C.      **Term of Office and Appointment**

1.      The term of office for the Chief Justice shall be one academic year from the day he/she is approved by the Senate.

2.      The term of office of the remaining six Justices shall be two academic years from the day they are approved by the Senate.

3.      All justices shall be appointed at least two weeks prior to the end of the term of the Justice he/she is replacing.

4.      Nominations to fill all vacancies in the Judiciary shall be made within fifty days.

D.      **Duties and Powers of the Supreme Court**

1.      The Supreme Court shall have jurisdiction over all interpretations of this Constitution, all legal issues arising of impeachment of Senate members and Executive Council members, all matters between the Executive Council and the Senate and all appeals from the lower court.

2.      The Supreme Court shall have the power to review any legislation brought before it in order to determine whether or not it is in accordance with this Constitution. The Supreme Court's decision on any legislation, policy or procedure is final.

3. To bring a case before the Supreme Court, an individual must have standing. Standing is defined as being a member of the Senate or the Executive Council, or a member of the Undergraduate Student Government directly affected by the issue being brought to trial.

4. Those issues limited to hearings of the Supreme Court are as follows:

   a. Elections \
   b. Impeachment
   c. Student Activity Fee
   d. All other issues of substance arising

**Section 3     Judicial Council**

**A.     Duties and Powers of the Judicial Council**

1. The Judicial Council shall consider those cases arising from issues not reviewed by the Supreme Court.

2. The President shall appoint three Judges subject to confirmation by two-thirds of the filled seats of the Senate.

**Section 4     Meetings**

A. All hearings of the Judiciary shall be in accordance with the New York State Open Meetings Law.

B. A quorum of Judiciary meetings shall be defined as a simple majority of filled seats.

C. There shall be written records of all decisions agreed on by the Judiciary.

**Article VI:     CLUBS AND ORGANIZATIONS**

**Section 1     Constitution**

A. Each Club and Organization shall establish a constitution subject to the review of the Judiciary.

**Section 2     Duties and Powers of Clubs and Organizations include, but are not limited to the following.**

A. To inform their constituents of relevant University wide issues.

B. The officers of the Clubs and Organizations shall be responsible for addressing the concerns of their constituents, and when necessary forwarding those concerns to the Executive Council.

C. To appropriate monies granted to the Club or Organization by the Undergraduate Student Government.

**Section 3     Clubs and Organizations Bureaus**

A. Each Club and Organization shall belong to one of the following Bureaus:

      i.      Bureau of Cultural Groups
      ii.     Bureau of Athletic Groups
      iii.    Bureau of Media Groups
      iv.    Bureau of Academic Groups
      v.     Bureau of Advocacy Groups
      vi.    Bureau of Programming Groups
      vii.   Bureau of Service Groups

**B.**    The Bureaus shall be represented in the Senate by the appropriate Executive Council member as non-voting members with full speaking powers as follows:

      i.     Vice President of Academic Affairs—Bureau of Academic Groups
      ii.    Vice President of Communications—Bureau of Media Groups
      iii.   Vice President of Student Life, Programming and Activities—Bureau of Programming Groups
      iv.    Freshman Representative—Bureau of Athletics Groups
      v.     Sophomore Representative—Bureau of Advocacy Groups
      vi.    Junior Representative—Bureau of Service Groups
      vii.   Senior Representative—Bureau of Cultural Groups

## Article VII:  BUDGET PROCESS

## Section 1

**A.**    The Treasurer of the Undergraduate Student Government shall initiate the annual budgetary process of the Undergraduate Student Government. The budgetary process is outlined in detail in the financial policies of the Undergraduate Student Government.

**B.**    The process shall begin no later than November 15th of the Fall Semester and end no later than April 30th of the Spring Semester.

**C.**    The Treasurer shall be the Chair of the Budget Committee of the Undergraduate Student Government. This committee shall be in charge of coordinating the budget process and producing a draft annual budget with the Treasurer. The draft annual budget shall be submitted to the Senate for approval.

**D.**    The Budget Committee must set up Budgetary Hearings with the clubs and organizations before it decides on a draft budget. The Office of the Treasurer shall schedule such hearings.

**E.**    The Senate may modify the proposed annual budget of the Undergraduate Student Government, prior to its approval. The approval shall be completed by April 15th of the Spring Semester.

**F.**    The approved budget by the Senate shall be submitted to the Vice President of Student Affairs for final approval.

**G.**    Should the Senate be unable to meet or to complete its task by the stated deadline, the Executive Council shall proceed on behalf of the Senate.

H.      Deadlines regarding the budget process may be extended by upon recommendation of the Treasurer, approval by the Senate, and after consultation with the Vice President for Student Affairs.

## Article VIII   IMPEACHMENT

### Section 1      Executive Council Members

A.      An Executive Council member may only be impeached by a three-quarters vote of the filled seats of the Senate.

B.      An Executive Council member who has been impeached shall be tried in the Supreme Court. The Supreme Court can remove the Executive Council member by a three-quarters vote of its filled seats.

C.      An Executive Council member may be impeached and removed for material violations of this constitution, legislation, policies or procedures of the Undergraduate Student Government, or a wrongful act of substance.

### Section 2      Senate Members

A.      A Senate member may only be impeached by a three-quarters vote of the filled seats of the Executive Council.

B.      A Senate member who has been impeached shall be tried in the Supreme Court. The Supreme Court can remove the Senate member by a three-quarters vote of its filled seats.

C.      Senate members may be impeached and removed for material violations of this constitution, legislation, or policies or procedures of the Undergraduate Student Government, or a wrongful act of substance.

### Section 3      Judiciary Members

A.      A Judiciary member may only be impeached by a three-quarters vote of the filled seats in both the Executive Council and the Senate.

B.      A Judiciary member may be impeached and removed for material violations of this constitution, legislation, or policies or procedures of the Undergraduate Student Government, or a wrongful act of substance.

## Article IX:   REFERENDA
### Section 1.    Initiation and Approval

A.      There shall be four types of referenda:

1.      Advisory Funding Referendum – referendum on the use of the Student Activity Fee, including whether a club/organization shall be budgeted money. Advisory funding referenda are not binding on the Undergraduate Student Government in accordance with the SUNY Chancellor's Guidelines.

2.      Amendment Referendum – referendum dealing with amendments to the Constitution. This type of referendum is enumerated and shall be carried out in accordance with in

Article XI, Section 1 of this Constitution. Amendment referenda are binding on the Undergraduate Student Government.

3.      Student Activity Fee Referendum – referendum on the amount of the Student Activity Fee. This type of referendum may be placed on or removed from the ballot by two-thirds votes of those present at the Senate and the Executive Council, or by a petition of fifteen percent of the membership of the Undergraduate Student Government, and shall pass by a simple majority of votes cast at the ballot in a general election. Student Activity Fee referenda are binding on the Undergraduate Student Government.

4.      Mandatory Student Activity Fee Question – Once every two years during the Spring election for President, the Undergraduate Student Government shall have a referendum on whether the Student Activity Fee shall be mandatory or voluntary in accordance with the SUNY Chancellor's Guidelines. This type of referendum shall pass by a simple majority of votes cast at the ballot. A Mandatory Student Activity Fee Question may be held in addition to holding this type of referendum once every two years, provided that a two-thirds majority of those present at the Senate and the Executive Council agree, and such determination shall take effect for the following academic year. Mandatory Student Activity Fee Questions are binding on the Undergraduate Student Government.

B.      An advisory funding referendum may be placed, removed, replaced, or reinstated on the ballot by a simple majority vote of those present in of the Senate or the Executive Council, or by a petition of fifteen percent of the membership of the Undergraduate Student Government.

**Article X:**      **Summer Senate**

**Section 1**      **Membership**

A.      The President of the Undergraduate Student Government and the President Pro Tempore of the Senate shall appoint 10 members to serve on the Summer Senate based on the proportionality guidelines previously noted under Article IV, Section 1. A. 3. c.:

     a.      Health Science Center Undergraduates
     b.      College of Arts and Sciences
     c.      College of Engineering and Applied Sciences

**Section 2**      **Duties and Powers of the Summer Senate**

A.      The Summer Senate shall meet at least once during each Summer session.

B.      All legislation passed by Summer Senate is only binding for the remainder of the Summer sessions.

C.      The Summer Senate shall approve the Summer budget by a two-thirds vote of the filled seats of the Summer Senate.

**Section 3**      **Presiding Officer and Agenda**

A.      The Executive Vice President of the Undergraduate Student Government shall be the Chair and set the agenda for Summer Senate meetings; in her/his absence the President Pro Tempore shall preside.

**Article XI:    AMENDMENT**

**Section 1      Adoption**

A.    An amendment may be initiated by either a petition of one-third of the Undergraduate Student Government or a two-thirds vote of the filled seats of the Executive Council and two-thirds of the filled seats of the Senate.

B.    A two-thirds vote of the Undergraduate Student Government by referendum shall be required to adopt an amendment to this constitution.

**Article XII:   ADOPTION OF THIS CONSTITUTION**

If ratified by a simple majority vote of the ballots cast in a general election of the Undergraduate Student Government, this constitution shall immediately take effect and supercede all previous constitutions of the Student Polity Association, Inc.

# Financial Bylaws

Be it enacted by the Senate of the Undergraduate Student Government,

§ 101.  SHORT TITLE
§ 102.  DEFINITIONS
§ 103.  BUDGET, REVENUE AND EXPENSES
§ 104.  RESTRICTIONS ON EXPENDITURES
§ 105.  OFF-CAMPUS TRIPS
§ 106.  FUNDRAISING
§ 107.  REQUIREMENTS TO BE ELIGIBLE FOR USG FUNDING
§ 108.  AVAILABLE TYPES OF FUNDING
§ 109.  CONSTITUTIONS
§ 110.  FUNDED ORGANIZATIONS' MEMBERS BILL OF RIGHTS
§ 111.  SPENDING APPROPRIATED MONEY
§ 112.  PURCHASING EQUIPMENT
§ 113.  CO-SPONSORSHIPS
§ 114.  BUDGET PROCESS
§ 115.  FACTORS CONSIDERED DURING THE BUDGET PROCESS
§ 116.  USG SERVICES
§ 117.  CONFLICTS OF INTEREST AND ETHICAL BEHAVIOR
§ 118.  JUDICIAL REMEDY
§ 119.  EFFECTIVE DATE

## § 101.  SHORT TITLE

This Act may be cited as the 'Financial Bylaws of the Undergraduate Student Government.'

## § 102.  DEFINITIONS

For the purpose of this act, the following definitions shall apply, unless the context indicates otherwise:

> CLUBS/ORGANIZATIONS — The phrases 'funded organization' shall mean any program or group funded by the Undergraduate Student Government.

> DEPARTMENT — The word 'Department' shall include any agency, department, office or officer of the Undergraduate Student Government.

> CONSTITUTION — The term 'constitution' shall include the constitution, bylaws, operating guidelines, Acts of the Senate, corporate

organizations, e.g. Audio Visual, Events Management, COCA, or the Ticket Office.

(4) Miscellaneous Income – gifts and donations. In general, gifts and donations greater than $500 should be deposited in the Stony Brook Foundation, a 501c3 corporation recognized by the Campus as the fundraising arm of the University. Gifts and donations will be deposited in the USG club/organization's account, and must be utilized in the academic year received.

(e) Appropriations are monies made available by law to funded organizations and to pay for administrative costs of the Undergraduate Student Government, which are divided into the following categories:

(1) Salaries and Wages – for full-time employees (e.g. Administrative Director, Office Administrator, and Ticket Office Manager), and also includes wages for student staff.

(2) Professional Fees e.g. Audit, Legal

(3) Operating expenses of the Undergraduate Student Government and the Departments thereof, which may differ or be distinct from funded organization expenditures and subject to different restrictions.

(A) Expenditures made by the executive branch, or its agencies, shall be subject to the approval of the President.

(B) Expenditures made by the legislative branch shall be subject to the approval of the Senate, or an officer of the same, as the Senate shall by its rules direct.



(C) Expenditures made by the Judicial branch shall be subject to the approval of the Chief Justice.

(4) Funded Organization Expenses

(A) Equipment and Furniture – computers, printers, copiers, desks, lockers, etc.
(B) Supplies – office supplies, such as pens, stationary, toner, paper, etc
(C) Food and Beverages
(D) Clothing
(E) Travel
(F) Telephone
(G) Advertising and printing – flyers, banners, posters, invitations, etc.
(H) Audio-Visual – charges related to audio/visual support for microphones, lighting, and sound equipment.



(7)   No monies appropriated by the Undergraduate Student Government shall be used to print, publish or broadcast obscene or libelous materials.

(8)   For legal reasons and to comply with aforementioned requirements, all material printed, published or broadcast by funded organizations in languages other than English must also be made available to the Undergraduate Student Government and its members in English.

(9)   Expenditures for events or activities that significantly deviate from a funded organization or department's missions and goals shall not be permitted.

(10)  Funded organizations and departments are permitted to allocate no more than 5% of available tickets as complimentary tickets; and priority should go to people who have volunteered and assisted with the preparation of a particular event, but have received no compensation

   (A)   The proposed comp. list must be submitted to the USG Administrative Director at least 3 business days prior to the event for pre-approval.
   (B)   The list must include the following information:
      (i)   Full name of the person receiving the complimentary ticket
      (ii)   Solar ID number (where applicable);
      (iii)  Whether they are a student or non-student (e.g. faculty, staff, etc.);
      (iv)   Rationale for the person receiving a complimentary ticket (e.g. E-board member, volunteers, advisor etc.).

## § 105.  OFF CAMPUS TRIPS

(a) Off Campus Trips defined.

(1) Off-campus trips shall consist of activities which occur on property not belonging to Stony Brook University, including but not limited to, the following types of activities:

   (A) Trips to hotels and conference halls.
   (B) Trips to amusement parks and recreational facilities.
   (C) Trips to athletic or academic competitions, or similar activities.
   (D) Trips to performances or theaters.

(2)   The following activities shall not be considered off-campus trips for the purposes of restrictions found in subsections (c) of this section:

(2) Non-students participating in off-campus trips funded by the Undergraduate Student Government shall be responsible for paying 100% of the total cost of the trip per person.

(3) The costs of coaches, trainers or staff participating in off-campus trips shall be determined by the duly-signed contracts between the USG, funded organizations and such persons.

(e) Enforcement

(1) The Senate budget committee shall take the restrictions of this section into consideration during the budget process.

(2) The President and Treasurer shall be responsible for developing procedures in order to carryout the provisions of this section.

## § 106. FUNDRAISING

(a) Rules Pertaining to Fundraisers —
Funded organizations and USG Departments may carry-out fundraisers to raise revenues for their organization and charity in addition to the money appropriated by the Undergraduate Student Government, but all fundraisers taking place on campus and/or utilizing appropriated money shall be subject to the following restraints:

(1) Prior to engaging in fundraising activities on-campus, the officer(s) responsible for the event must complete the "Application for Permission to Fundraise on Campus," be pre-approved by Student Union and Activities and receive pre-approval from the USG Treasurer and Administrative Director and all such pre-approvals must be received at least one week prior to the event.

(2) All revenues generated on-campus by the sale of tickets must be collected by the USG Accounting Office, the USG Ticket Office, or other designated Department.

(3) All other revenues generated on-campus shall be received under the supervision of the funded organization's Treasurer or the USG Treasurer and submitted to the USG Accounting Office within one (1) week of its receipt to be placed in the organization's on-campus account.

(4) If funded organizations generate revenue by off-campus fundraising using appropriated money, or generated by sale of advertising space or time in publications, broadcasts or events paid for by appropriated money, then the organization's on-campus account must be reimbursed the cost of such publishing, broadcasts, or events, but any additional revenue may be placed into the organization's off-campus account.

or revision budget until it receives two consecutive semesters of SSC funding and receives approval from the Senate for a line budget.

(c) Loss of eligibility—

(1) No funded organizations or departments operating in violation of this Act shall be eligible for funding until they shall come into compliance with the same.

(2) The USG Treasurer and the Administrative Director may freeze the budget of funded organizations in violation of this Act, or in the case of disagreement between them, the President may make the final decision.

(3) The Senate may by law revise the appropriations of money made to funded organizations if they, by violating this act, lose eligibility for funding.

## § 108. AVAILABLE TYPES OF FUNDING

(a) Organization of Funds Distributed by Law—

Funds not yet appropriated by the Undergraduate Student Government shall be organized into a single account for appropriation by the Senate by law. Acts of appropriation are subject to amendment by the Senate at a later date. The types of funding available to organizations and departments is as follows:

(1) Line Budget Money—
A line budget is the account given to a funded organization or department for the entire year to be expended by them in accordance with the laws of the Undergraduate Student Government

(2) Grant Budget Money—
Grant Budget Money shall be given to funded organizations or departments for large one-time purchases or event in order to prevent sudden increases or fluctuations in their annual line budgets. Items that fall under the grant budget shall not be included in the line budget.

(A) In order to be eligible for a grant budget for equipment, there must be a proven need of the items necessary for the funded organization or department, and the lifespan of the items must be at least two (2) years from the date of purchase.
(B) Any funded organization or department that receives a grant budget shall not be eligible for another grant for two (2) years.

(3) Revision Budget Money—

SSC will not recognize a co-sponsorship by two or more sororities or fraternities as an "IFSC cosponsored event."

(4)  IFSC can co-sponsor an event with USG funded organizations, provided that Individual Social Fraternities and Sororities may not display their organization's Greek letters on such co-sponsorship event advertising, as it implies student fee funding of Social Greek Organizations.

## § 109.  CONSTITUTIONS

(a)  Every funded organization shall submit to the USG Treasurer a copy of its current duly adopted constitution, and no other copies of the constitution shall be recognized by any officer of the Undergraduate Student Government as lawful and legitimate.

(b)  The times, places and manner of holding elections for positions in funded Organizations shall be prescribed in the constitutions thereof; but the Senate may at any time by Law make or alter such regulations.

(c)  Every funded organization's constitution shall include the following:

(1)  An open membership clause stating that any member of the Undergraduate Student Government shall be permitted to join the organization and receive the services and benefits thereof on an equal-opportunity basis.

(A) Constitutions may provide qualifications on voting rights of members on the basis of the number of meetings attended or the student's length of membership; but all such qualifications shall apply uniformly to all members.

(i)  Constitutions of resident legislatures and the Commuter Student Association may restrict voting qualifications to residents in the buildings or commuters, respectively.

(B) Constitutions may provide qualifications on serving on the Executive Board of funded Organizations provided that such qualifications shall not discriminate on the basis of race, religion, sex, color, national origin, age, marital status, disability, viewpoint or sexual orientation— or other like criteria required by the laws of New York State.

(2)  A dissolution clause stating that all funds and assets accrued from the Undergraduate Student Government by any funded Organization shall, upon the dissolution of the Organization, revert to the control of the Undergraduate Student Government.

(3)  A statement of mission purposes and goals must be incorporated into all funded organizations constitutions.

(A) The aforementioned statement shall not be altered or amended without prior approval of the USG Treasurer and Senate.

(a) Voucher Process—

In order to utilize monies appropriated by law, the funded organization or department must submit a standard Voucher Form, accompanied by the minutes and attendance sheet documenting the allocation, and contracts or receipts when applicable.

(1) Completed vouchers an accompanying documents must be submitted to the USG Accounting Office 5-7 business days before the check is required, except in the case of contracts, which are required four (4) weeks prior the event.

    (A)    Requirements for a valid voucher—
           In order for a voucher to be valid:

        (i)     It must be completely filled out;
        (ii)    It must be legible.
        (iii)   It must have original itemized receipts attached, when applicable.
        (iv)   Voucher must have the signatures of the President, Treasurer, and Secretary registered with Student Union and Activities and the USG Accounting Office.
        (v)    Must have the Minutes and Attendance of the meeting, which record the allocation (Allocations must be clearly indicated in the minutes.)
        (vi)   Must have a quote or a detailed list of the items being purchased
        (vii)  A Contract Request Form should be attached, if applicable. Such forms must be submitted four (4) weeks prior to the event and contracts for services must be submitted prior to services being rendered.

    (B)    Checks are processed Tuesdays and Thursdays, and are available by the end of the day.

(2) Voucher Rejection by the Accountant—
Vouchers can be rejected for the following reasons by the Accountant:

    (A) Missing documentation (Minutes, Attendance etc.)
    (B) Incomplete information.
    (C) Paperwork submitted late (not within the designated timeline)
    (D) Lack of funds in the organization account.
    (E) The Organization's budget is frozen
    (F) Wrong or improper signature on voucher.
    (G) Current signature card showing signatures of registered President, Treasurer and/or Secretary is not on file
    (H) Current organization constitution or bylaws is not on file.

(4) Reimbursements — Reimbursements are payment for items after they have been purchased by a funded organization, department or officer and members thereof with non-USG funds.

(A) All requests for reimbursement must be accompanied by original itemized receipts, along with voucher, minutes, and attendance.

(B) All reimbursements must be pre-approved by the USG Treasurer. Funded organizations will not be reimbursed for sales tax, since USG is a tax-exempt organization.

(C) Each account is only permitted up to two (2) reimbursements per semester.

## § 112.  PURCHASING EQUIPMENT

(a) The Treasurer of each USG funded organization is responsible for safekeeping and tracking the organization's equipment. Ultimately the clubs are responsible to safeguarding and storing their equipment.

(b) A list of all equipment purchased by USG's funded organizations and departments will be maintained by the Accountant, who will periodically verify the location and condition of the equipment.

(c) If requesting to purchase equipment that cost more than $1000 or greater, two formal price quotes from different vendors must also be submitted. The voucher should explain the reason for the purchase, and the location where the equipment will be kept.

(d) Equipment should be purchased for the benefit of the funded organization, and not any officer or member thereof. Dissolution of the organization or misuse of equipment, as determined by the Treasurer and Administrative Director, shall require said equipment to be returned to USG.

(e) NO EQUIPMENT SHALL BE DISPOSED OF WITHOUT PRIOR AUTHORIZATION FROM THE ACCOUNTANT and the Accountant shall notify the President and Treasurer when any equipment is disposed of.

(f) Fixed assets are items that have physical substance and a life in excess of one year, and are acquired (purchased or donated) for use in the operation of the business. The more common examples are computer equipment, software, copy machines, furniture, fixtures, audio visual equipment, and boats. Purchased property and equipment will be capitalized at cost, including all of the costs necessary to place those assets into service. Donated property and equipment are recorded as contributions in the period received at fair market value. Small insignificant items are expensed in the year purchased.

(f) The use of fraud to receive property or money properly belonging to Undergraduate Student Government, embezzlement, gross misuse of USG property or assets for personal benefit, or any other such illegal activity is prohibited, and any person or organization caught engaging in such activities shall be subject to punishment by the Undergraduate Student Government, Stony Brook University and civil or criminal penalties of New York State and the United States, where applicable.

## § 118. JUDICIAL REMEDY

Any student affected by violations of this Act or any other laws of the Undergraduate Student Government, the Treasurer of the Undergraduate Student Government, or the Advocate General may initiate proceedings in the Judiciary of the Undergraduate Student Government against funded organizations for said violation.

(1) The courts of the Undergraduate Student Government are hereby authorized to:

(A) Declare the constitution, in whole or in part, of any funded organization illegal, null and void, and the budget of said organization shall be immediately frozen until its constitution shall be amended and brought into compliance with the Constitution and laws of the Undergraduate Student Government;
(B) grant equitable relief to the harmed party; and
(C) freeze the budgets of funded organizations that engage in activities which violate the laws of the Undergraduate Student Government.

(2) This section shall not be construed to limit or prohibit the Undergraduate Student Government from enacting punitive measures authorized by law against funded organizations in violations of the laws thereof.

## § 119. EFFECTIVE DATE; REPEAL
(a) This act shall take effect immediately following the enactment of this act.
(b) The Financial Bylaws of the Undergraduate Student Government in effect prior to the enactment of this Act are hereby repealed.

Executive Vice President of the Undergraduate Student Government,
And President of the Senate
Passed by the Senate on the eighth day of November, two thousand and seven

President of the Undergraduate Student Government
Signed the _eighth_ day of November, Two Thousand and Seven

**EXHIBIT I**

## STONY BROOK UNDERGRADUATE STUDENT GOVERNMENT
## AND FACULTY STUDENT ASSOCIATION
## AGREEMENT FOR SERVICES

This agreement is between the Stony Brook University Undergraduate Student Government (USG) and the Faculty Student Association (FSA) for independent fiscal agent and related services, which FSA is authorized to provide as the University's auxiliary services corporation. The responsibilities of the USG, as expressly set forth in SUNY Student Activity Fee Policy and the Fiscal Accounting Procedures for Mandatory Student Activity Fee Programs remain primary and the implementation of such services in the carrying out of such responsibilities by the FSA are not a substitute for the same. The Agreement is approved by the Vice President for Student Affairs (VPSA) as designee of the Campus President for matters related to the undergraduate student activity fee.

This agreement provides USG with:
    custodial and disbursement services by which undergraduate student activity fees are budgeted, encumbered, and processed for payment in accordance with University policies;
        accounting and reporting functions;
        procurement of other services including insurance and consulting;
        payroll and human resources services; and
        mechanisms for internal control including inventory management and audit responsibilities;

FSA agrees to provide the following services to USG:

Control and Disbursement Services:

1.  FSA will accept USG Activity Fees and other funding (such as ticket revenue and club donations) and deposit such funding in Agency Accounts held by FSA or the Stony Brook Foundation solely for the purpose of USG funds. All interest, dividends, and capital gains will be accrued to the accounts in the name of USG. Accounts will be invested in financial vehicles that guarantee the preservation of principal.

2.  FSA will make disbursements, on an established twice per week check cycle, in accordance with *USG Financial Policies and Procedures.* Checks will be issued under the name of "Undergraduate Student Government – FSA Agency Account". Check disbursement entries will be cross-referenced to applicable vouchers, standard voucher forms shall be used, and specimen signatures of persons authorized to approve vouchers for payment and authorized to sign checks shall be on file, in accordance with the SUNY *Fiscal and Accounting Procedures for Mandatory Student Activity Fee Programs.*

3. FSA will make provisions to issue a limited number of manual checks when requested by the USG President, Treasurer, or Administrative Director, according to guidelines specified by the FSA Controller in the *USG Financial Policies and Procedures.*

4. FSA will make provisions for payments to be made by "petty cash" when needed by USG, according to guidelines specified by the FSA Controller in the *USG Financial Policies and Procedures.* A petty cash system shall be established and kept current utilizing a petty cash journal.

5. FSA will provide a system by which funds can be encumbered when vouchers are encumbered and contracts are approved and a mechanism to generate purchase orders when required by vendors as covered in the USG Policies and Procedures.

6. FSA will provide a mechanism by which advances can be issued, in accordance with guidelines specified by the FSA Controller in the *USG Financial Policies and Procedures* and other approvals as required in the USG Policies and Procedures.

7. The designated FSA Staff will review all USG vouchers before payment for compliance with USG Financial Guidelines. In the event that a voucher is not in compliance with these guidelines (i.e. missing required signatures, missing supporting documentation, insufficient budget allocation, etc.), the voucher will not be processed but will be promptly returned to the USG club or agency which submitted the voucher. The voucher may be resubmitted for payment when the deficiencies have been corrected. Paperwork flow of vouchers is logged by FSA and USG staff who handle the documents, and available for review by USG.

8. The designated FSA Staff will review all USG vouchers before payment for compliance with SUNY *Student Activity Fee Policy,* SUNY *Fiscal and Accounting Procedures for Mandatory Student Activity Fee Programs, USG Financial Policies and Procedures, and* SBU policies and procedures. If there appears to be a conflict with the Guidelines or Policies, the voucher will not be processed but will be promptly returned to the attention of the USG Administrative Director for follow-up.
   Examples of such conflicts would be:
   - an expenditure that does not appear to be in keeping with the Use of Funds as specified in Student Activity Fee Policy (302.14(c)(3);
   - an expenditure that is not consistent with New York State Guidelines for reimbursement (see SUNY *Fiscal and Accounting Procedures for Mandatory Student Activity Fee Programs*: II.F)
   - an expenditure that does not appear to be consistent with the USG Budget, as approved by the Campus President's designee.
   If the student club or agency wishes to pursue payment for the voucher in question, the USG Administrative Director will coordinate the appeal process in accordance with Student Activity Fee Policy (302.14(c)(1)(b). If the appeal is successful, the voucher and the approved appeal paperwork may be resubmitted for prompt payment by FSA.

9. All vouchers, purchase orders, and contracts signed by an employee or agent of FSA or the Campus will contain the statement, "Approval of any fiscal commitment by the Stony Brook

Undergraduate Student Government contained herein indicates compliance with the provisions of Policy for Student Activity Fees and does not constitute a fiscal obligation of the State of New York or the Faculty Student Association".

10. FSA will assist USG in assuring the best possible pricing in its purchasing processes, including the bidding of services for contracted services. In accordance with SUNY *Fiscal and Accounting Procedures for Mandatory Student Activity Fee Programs* (Item I.A. paragraph 5), and USG Financial Policies and Procedures, services for independent accounting audit, legal, and insurance should be re-bid every three years to assure quality and value to the organization.



### Accounting and Reporting

11. FSA will employ a Senior Accountant and other accounting support staff, as needed, who will be designated to provide the FSA services as specified in this agreement. FSA will include the USG Executive Council in hiring, evaluation, and termination processes related to these positions.

12. The designated FSA Staff will provide the USG Treasurer with the following reports:
    a. Access to current, detailed Budget to Actual expenditure report, for all clubs and departments.
    b. Check register on a weekly basis.
    c. Summary financial reports, compared to budget, for reporting to the USG Senate and general student body on as ad-needed basis.

13. FSA will maintain the appropriate accounting system and software that provides the reports needed by USG with corresponding entries into FSA Agency Account general ledger, in accordance with generally accepted accounting procedures.   $ 810.50 Kinkuo $

14. FSA will ensure that all tax returns are timely filed on behalf of USG.

15. FSA will provide support to the USG Treasurer in the budgeting process. FSA will provide support for a system covered in the USG Financial Policies and Procedures by which USG budget decisions are compiled into a budget document for review and approval by the Campus President's designee.

### Procurement of Other Services including Insurance and Consulting

16. In cooperation with the USG Administrative Director, FSA will procure adequate insurance for USG activities and events. This will include general liability insurance, insurance to protect the assets and resources of USG, material risk, and fidelity bonding, as required by *SUNY Fiscal and Accounting Procedures for Mandatory Student Activity Fee Programs*. The State University of New York and the Faculty Student Association shall be named as co-insurers on USG liability insurance policies.

17. FSA will engage necessary and independent consultants to provide services to USG, such as those for USG's financial system.

Payroll and Human Resources Services

18. FSA will provide employment and human resources services for professional and student staff reporting to USG consistent with those services provided by FSA to other campus agencies. These staff will receive the standard FSA benefit package and training in FSA personnel policies and procedures. The USG President will serve as the supervisor of the USG Administrative Director. FSA will provide training in personnel policies and procedures to all USG supervisors, including the USG President. *applies to: Ensure - Benefits + Holidays*

19. FSA will provide payroll services for USG professional and student staff. Paychecks will be produced on a bi-weekly basis.

20. FSA will ensure that all payroll related state and federal government forms are filed.

Mechanisms for Internal Control including Inventory Management and Audit:

21. FSA, in cooperation with the USG Administrative Director, will maintain appropriate policies and records for fixed assets and inventory owned by USG. This system shall include specific provisions for assigning responsibility to the users or holders of the assets and makes them accountable for those assets when they leave or transfer their responsibility.

22. FSA will periodically review financial systems and make appropriate recommendations as needed for improvements to USG.

23. Designated FSA staff will review USG contracts for compliance with *USG Financial Policies and Procedures* and the USG budget. FSA will encumber funding for contracts. FSA will pay vendors upon submission of duly authorized and completed paperwork.

24. FSA will provide support to USG to develop and maintain USG's fiscal and control policies that are in keeping with SUNY *Fiscal and Accounting Procedures for Mandatory Student Activity Fee Programs*.

25. The FSA Controller or his/her designee(s) will periodically conduct internal reviews and audits of the USG financial statements and supporting documentation for consistency with SUNY *Mandatory Student Activity Fee Policy* and SUNY *Fiscal and Accounting procedures for Mandatory Student Activity Fee Programs* and generally accepted accounting procedures.

26. FSA will engage and assist an independent certified public accountant for preparing year-end financial statements and government tax returns for USG..

27. When USG activity fee funding is audited by SUNY or other agencies, FSA will provide coordination and support for that audit.

<u>The fee for FSA's services to USG will be calculated as the sum of the following components:</u>

1.  Cost of salaries and benefits for Accounting Staff. as determined through the FSA Budget process, employed by FSA and assigned to providing the services described in this agreement. (In the event that a staff member is not assigned to USG duties on a full time basis, the expense to USG will be pro-rated accordingly. A record shall be kept of such costs which shall be open to audit, as reasonably requested, by the USG)

2.  Direct expenses incurred by FSA on behalf of USG, such as payroll processing, independent consultants, and legal expenses for defending actions brought in relation to USG activities.

    *Legal fees should be on FSA not USG*

3.  Reimbursement for FSA general and administrative staff effort (such as that the FSA Executive Director, Controller, and Human Resources and Accounting staff) in support of the services defined in this agreement. This shall be calculated as the proportion of salary, benefits and associated support expenses based on the percentage effort determined from the daily time reports kept by those FSA staff members. Starting with the budget for fiscal year 2004-05, this amount shall be calculated based on the time and effort analysis of the previous year. As there is not a full prior experience at the start of this Agreement, the fee for fiscal year 2003-04 ($85,640) has been calculated based on current effort experience, which shall be reviewed on an annual basis.

    *This is FSA's mess + no time should be charged to USA.*

Agreed:

_Sandy A. Curtis_
Sandy Curtis
USG President

_Kevin Kelly_
Kevin Kelly
FSA Executive Director

_Clayton John_
Clayton John, Vice Treasurer

Approved:

_Fred R. Preston_
Frederick R. Preston
Vice President for Student Affairs

## STONY BROOK UNDERGRADUATE STUDENT GOVERNMENT
## AND FACULTY STUDENT ASSOCIATION
## ADDENDUM TO
## THE AGREEMENT FOR SERVICES

At the recommendation of the independent auditors for the Stony Brook Undergraduate Student Government (USG), this Addendum is made to the Agreement for Services between USG and the Stony Brook Faculty Student Association, dated _____.

The section of the Agreement on "Payroll and Human Resources Services" shall be modified to include:

Financial liability incurred from accrued vacation days, accrued sick days (where applicable) and accrued all purpose days (APD), for employees provided by FSA to USG, will be assumed solely by the USG. These positions include: Administrative Director, Accountant, Office Administrator, Bookkeeper, Account Clerk, Ticket Office Manager and SBU TV Technician, and other USG staff positions that may be added by USG.

Agreed:

_____    2/18/05
Jared Wong
USG President

_____    2/19/05
Kevin Kelly
FSA Executive Director

Approved:

# Faculty Student Association
## Organizational Chart - June 2005

Case 2:09-cv-03610-LDW-MLO   Document 1-2   Filed 08/20/09   Page 51 of 53 PageID #: 102

- FSA Board of Directors — Daniel J. Melucci
  - Kevin Kelly — Executive Director
    - Warren Wartell — Associate Director, HR & Marketing
      - Christine Oster — HR Manager, Employee Relations & Development
      - Dorothea Sutkevich — HR Manager, HRIR & Benefits
      - Godfrey Palain — Manager, Special Events
      - Angela Agnello — Director, Marketing & Communications
      - Dawn Villacci — Customer Advocate
      - Virginia Pace — Interior Facilities Designer
    - Ron Wills — Controller
      - Joseph Poppa — Accounting Manager
        - Michael Salegna — Accountant, University Hospital
        - Charlotte Gualtieri — Accountant/Payroll, University Hospital
        - Ramesh Das — Senior Accountant, LISVH
        - Thomas Edwards — Accountant, FSA Gen.
          - Barbara Leigh-Manuel — Bookkeeper, UB Gen.
          - Gayle Franze — Accounting Clerk
            - Audrey VanCott — Bookkeeper
              - Joyce Grimmet — Systems Support Manager
                - Umer Butt — Systems Support Asst. Manager
      - Velma Christensen — Accountant
        - Vacant — Bookkeeper, Accounts Payable
        - Mary Ann Campisi — Billing Manager, Meal Plan Office
          - Cindy Meyer — Manager, Meal Plan Office
          - Barbara Cronin — Supervisor, Meal Plan Office
          - Dorothy Devoe — Cash Room Supervisor
        - Cindy Wilson — Bookkeeper
    - Dawn Klingel — Associate Director, Retail Operations
      - Madeline Gifford — Retail Supervisor, Roosevelt Market Place
      - Vacant — Mgmt. Trainee - Provost's Liaison, University Bookstore
      - Lisa Gentile — Manager, Galleria Carts
    - Ken Johnson — Business Manager, West Campus Dining Services
      - Peter Nathanson — Manager, Operations and Security
        - Tony Gentile — Manager, Laundry Services
    - Lois Edelson — Manager, Student Health Insurance
      - 2 Senior Staff, 1 Office Assistant, State line - Co-reporting HR and FSA

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
-----------------------------------------------------------------------X

GAYLE FREESE,

Index No. 09- 27304

PLAINTIFF,

**VERIFICATION**

-against-

RONALD WILLA, WARREN WARTELL,
EUNICE RO, THOMAS EDWARDS,
PETER M. BAIGENT, JOSEPH ANTONELLI,
KEVIN KELLY, CHRISTINE OSTER, LOCAL 1102
RETAIL WHOLESALE AND DEPARTMENT STORE
UNION UNITED FOOD AND COMMERCIAL
WORKERS UNION, FACULTY- STUDENT
ASSOCIATION OF THE STATE UNIVERSITY OF
NEW YORK AT STONY BROOK, INC.,
UNDERGRADUATE STUDENT GOVERNMENT,

DEFENDANTS.
-----------------------------------------------------------------------X

STATE OF NEW YORK     )
                      ) ss.:
COUNTY OF SUFFOLK     )

**Gayle Freese**, duly sworn, deposes and says:

That I am a **Plaintiff** in the within action, to wit:  I have read the annexed **Verified Complaint** and know the contents thereof and the same are true to my knowledge, except as to those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe to be true.

My belief as to all matters not stated upon knowledge is based on all books, records, writings and other documents kept in the ordinary course of business.

_____
Gayle Freese

Sworn to before me on the 28
day of July, 2009

_____
Notary Public

LEE M. ZELDIN
Notary Public, State of New York
No. 02ZE6207565
Qualified in Suffolk County
Commission Expires June 15, 2013

Index No. 09-$27304$                    Year        RJI No.        Hon.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF SUFFOLK**

--------------------------------------------------------------------------X

GAYLE FREESE,

PLAINTIFF,

-against-                                                    **SUMMONS and VERIFIED**
                                                             **COMPLAINT**

RONALD WILLA, WARREN WARTELL, EUNICE RO,
THOMAS EDWARDS, PETER M. BAIGENT, JOSEPH ANTONELLI,
KEVIN KELLY, CHRISTINE OSTER, LOCAL 1102 RETAIL
WHOLESALE AND DEPARTMENT STORE UNION UNITED FOOD
AND COMMERCIAL WORKERS UNION, FACULTY-STUDENT
ASSOCIATION OF THE STATE UNIVERSITY OF NEW YORK AT
STONY BROOK, INC., UNDERGRADUATE STUDENT GOVERNMENT,

DEFENDANTS.

--------------------------------------------------------------------------X

LAW OFFICES OF
LEE M. ZELDIN, ESQ.
*Attorneys for Plaintiff*
180 East Main Street, Suite 308
Smithtown, New York 11787
(631) 645-1380

To                                        Signature (Rule 130-1.1-a)

_____

Attorney(s) for                               Lee M. Zeldin, Esq.

Service of a copy of the within          is hereby admitted.
Dated,

_____

Attorney(s) for

Please take notice
( ) NOTICE OF ENTRY
that the within is a (certified) true copy of a
duly entered in the office of the clerk of the within named court on
( ) NOTICE OF SETTLEMENT
that an order                       of which the within is a true copy will be presented for
settlement to the HON.                                     one of the judges
of the within named court, at
on                          at                    M
Dated,

Yours, etc.
LAW OFFICES OF
LEE M. ZELDIN, ESQ.
Attorneys for Plaintiff
180 East Main Street, Suite 308
Smithtown, New York 11787
(631) 645-1380